**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

BIRKENSTOCK US BIDCO, INC.,
BIRKENSTOCK USA, LP, and
BIRKENSTOCK IP GMBH,

Plaintiffs,

v.

WHITE MOUNTAIN INTERNATIONAL LLC
and AMERICAN EXCHANGE TIME LLC,

Defendants.

Civil Action
No. 24-cv-10610-PBS

**MEMORANDUM AND ORDER**

September 16, 2026

Saris, J.

## INTRODUCTION

In this dispute about "ugly sandals," Plaintiff Birkenstock, a footwear manufacturer, contends that Defendant White Mountain infringed its patent, trademark, and trade dress rights by producing and selling "knockoffs."[1] Specifically, Birkenstock alleges that White Mountain violated its trade dress rights in its Arizona two-strap sandal design with the Helga sandal, its Boston shoe design with the Bari sandal, and its Mayari toe-loop sandal design with the Gracie sandal. Birkenstock also alleges that White

[1] The Court refers to Plaintiffs Birkenstock US BidCo, Inc., Birkenstock USA, LP, and Birkenstock IP GmbH collectively as "Birkenstock" and to Defendants White Mountain International LLC and American Exchange Time LLC together as "White Mountain."

Mountain violated its trademark registration for its signature bone-pattern sole design.

White Mountain has moved for partial summary judgment on Counts II, III, IV and V of Birkenstock's second amended complaint on the ground that those claims are barred by the doctrine of laches.[2] White Mountain alleges that Birkenstock knew about the knockoffs in the 1990s but did not bring suit until 2024. Birkenstock responds that under the doctrine of "progressive encroachment," laches does not bar these claims primarily because sales of the White Mountain sandals were de minimis until 2018 and White Mountain cannot show prejudice after that date.

After hearing, the Court **DENIES** the motion for summary judgment (Dkt. 147). While there is evidence that Birkenstock's sales team has known about the White Mountain sandals since the 1990s, the facts are disputed as to whether White Mountain's sales were de minimis until 2018 and, thus, whether the progressive encroachment doctrine defeats White Mountain's laches defense.

---

[2] White Mountain and Birkenstock also submitted motions to strike certain paragraphs of the other's statement of material facts (Dkts. 198, 182), both of which are **DENIED** as moot because the Court does not rely on the identified paragraphs in resolving the motion for summary judgment.

## FACTUAL BACKGROUND

The following facts are undisputed, except where otherwise noted. See Deaton v. Town of Barrington, 100 F.4th 348, 353 (1st Cir. 2024).

### I. Birkenstock's Products

Birkenstock has sold and distributed sandals in the United States since the 1960s. The Birkenstock sandals at issue are the Arizona sandal ("Arizona"), the Boston clog ("Boston"), and the Mayari sandal ("Mayari").[3] All three models have been sold in the United States for years, the Arizona since 1973, the Boston since 1976, and the Mayari since 2009.

Since at least 1982, Birkenstock has used a bone-pattern design on the soles of its shoes (the "Bone-Pattern Mark"). In 2000, Birkenstock applied to register the Bone-Pattern Mark as a trademark with the literal element "BIRK." The United States Patent and Trademark Office ("USPTO") granted the registration on July 30, 2002, issuing Registration No. 2,600,060. In 2023, Birkenstock applied to register the Bone-Pattern Mark as a trademark without the literal element "BIRK." The USPTO granted the registration on December 10, 2024, issuing Registration No. 7,593,347.

[3] The fourth Birkenstock product at issue in the litigation, the Buckley clog, is the basis for Birkenstock's claim of patent infringement, which is not challenged by the current motion for partial summary judgment.

## II. <u>White Mountain's Sandals</u>

White Mountain sells footwear to retail stores in the United States in two different ways. It sells WHITE MOUNTAIN-branded products to wholesale retailers, which then sell those products to consumers. It also sells the same footwear designs to discount retailers, which then sell the products to customers under private labels unique to each particular retailer. White Mountain markets and sells footwear directly to consumers as well through its website and social media.

The following are pictures drawn from the second amended complaint of Birkenstock sandals and the accused sandals sold by White Mountain:

**Birkenstock's Asserted Rights**



***Arizona Sandal Design***

**White Mountain's Sandals and Clogs**



***Helga Sandal***



*Boston Shoe Design*



*Bari Sandal*



*Mayari Sandal Design*



*Gracie Sandal*



*D257 Patent*



*Bueno Sandal*



*Bone-Pattern Marks*



*Helga Sandal Outsole*

Dkt. 88 ¶ 3.

**A. The Helga**

From 1992 to 1995, White Mountain contracted with a retailer for the sale and purchase of a specific design of sandal that would later be named "Helga." In 1995, White Mountain began selling the Helga to wholesale retailers under the WHITE MOUNTAIN brand and to other retailers under private-label brand names. Since at least 1998, White Mountain's Helga sandals have been sold and marketed on the QVC television network. Since at least 2014, White Mountain has marketed the Helga on social media. Data relating to sales of the Helga prior to 2005 is not available.

**B. The Getty/Bari**

From 1992 to 1995, White Mountain contracted with a retailer for the sale and purchase of a specific design of clogs that would later be named "Getty" and eventually renamed "Bari." In 1995, White Mountain began selling the Getty to wholesale retailers under the WHITE MOUNTAIN brand and to other retailers under private-label brand names. Since at least 1998, the Getty/Bari has been sold and marketed on QVC. Records of sales of the Getty/Bari prior to 2003 are not available, but since 2003, White Mountain has marketed and sold the Getty/Bari and equivalent private-label clogs to numerous wholesale customers in the United States, and revenues tied to those sales have increased over time. White Mountain has marketed and offered the Getty/Bari online since 2006

and has marketed the Getty/Bari on social media since 2014.[4] Around 2018, the Getty was renamed "Bari."

### C. The Gracie

White Mountain first began selling a sandal named "Carolyn" in 2016. White Mountain submits that around 2017, White Mountain changed the name "Carolyn" to "Gracie" and began selling the Gracie to wholesale retailers and to other retailers under private-label brand names.[5] Since at least 2018, White Mountain has sold the Gracie sandal and equivalent private-label sandals to numerous wholesale customers, retail stores, and e-commerce sellers throughout the United States, and revenues tied to those sales have increased over time. White Mountain has sold the Gracie online since 2017 and has marketed the Gracie on social media since 2018.

### D. The Dogbone Tread

White Mountain has sold footwear products with a dogbone-shaped outsole tread design to customers since the mid-1990s. White Mountain cannot identify which footwear products it sold to customers in the United States had the dogbone tread; however, its products were featured on QVC with visible dogbone treads since at least 1998 and sold on the White Mountain website accompanied by images of the dogbone treads since at least 2015.

---

[4] No units of the Getty/Bari were sold from 2011 to 2013.

[5] Birkenstock disputes that the Carolyn and the Gracie were the same shoe and that the shoe was sold to wholesalers under private-label brand names.

## III. Birkenstock's Awareness of White Mountain's Sandals

White Mountain contends that internal and public documents from the 1990s show that Birkenstock was aware of knockoffs being sold in the market. In 1994, a magazine article quoted Tim Black, Birkenstock's sales director, as stating: "Copies come and go . . . [and] there are going to be people who buy the $49 knockoffs and are happy with them. But that's going to happen no matter what. We don't really have any plans of attack." Dkt. 155-12 at 11. David Bergum, a Birkenstock sales employee from 1991 to 2001 and the company's national sales manager from 2000 to 2001, testified that he participated in many conversations with sales and marketing personnel about how to limit competition from knockoff distributors. He also remembered speaking about competitors with company executives during conversations that "would have" included White Mountain "because it was very, very popular at the time." Dkt. 177-1 at 11. Bergum testified that "White Mountain was everywhere" and was "huge at the time," as "were a bunch of brands . . . selling those kinds of looks." Id. at 14-15. Bergum explained that the messaging he received from managers was to "dismiss[] them, along with any other look-alike" and instead "focus on what made Birkenstock special." Id. at 30-31, 39.

In 2008, White Mountain had no "drop-ship" business.[6] Around 2018, Robin DeCarlo Conners joined White Mountain in order to "build the internet business" and "handle drop-ship." Dkt. 180-32 at 19. Between 2017 and 2018, sales of the accused products increased by nearly 700% and White Mountain's customers for the accused products increased by 271%. In that same year, sales of the accused products via Amazon.com increased by over 300% and via Shoes.com by over 2,200%. The following graph submitted by Birkenstock shows White Mountain's sales of the accused products:

**Figure 3: White Mountain Sales (January 2010 – September 2025)**




[6] Drop shipping is a retail business model in which "the consumer orders the product at the retailer's website and the retailer forwards the order to [the brand] to be fulfilled directly from the inventory in [the brand's]'s warehouse." Dkt. 180-34 at 12.

Dkt. 180-32 ¶ 13.[7]

Between 2018 and 2024, sales from White Mountain's drop-ship business increased from under $1 million to $24 million. Marianne Gerbert, a former retail analyst at White Mountain, described the shift in strategy:

> [O]ur whole drop-ship internet business was increasing, but the department store, the actual store, brick and mortar part of the business was decreasing. So . . . whether it's Amazon or Macys.com or QVC.com or DSW.com, . . . there was less foot traffic in stores and more online, so there was a big push for us to build our online presence.

Dkt. 180-12 ¶¶ 8-15. By 2024, the drop-ship business accounted for over 13% of White Mountain's total sales of the accused products. Sales of the accused products during that time increased from $4.8 million to $16.8 million.

## IV. Cease-and-Desist Letter

In December 2021, Birkenstock sent a cease-and-desist letter to White Mountain directing it to surrender products bearing unauthorized versions of Birkenstock's trademarks and to cease manufacturing, distribution, advertisement, and sale of those products. On May 1, 2023, Birkenstock sent a second letter to White Mountain in which it asserted trade dress rights as to the Arizona, Boston, and Mayari and claimed White Mountain had infringed those

[7] This data is derived from the expert report prepared by Todd Schoettelkotte, Birkenstock's damages expert. Mr. Schoettelkotte's calculations include sales data for the Bueno, an accused product not at issue in the current motion for partial summary judgment.

trade dress rights by the manufacture and sale of White Mountain's Helga, Bari, and Gracie. This letter stated that "Birkenstock appreciate[d] White Mountain's recognition of Birkenstock's rights in the past and White Mountain's removal of the products that Birkenstock identified as infringing" and that "White Mountain took down [certain products] following Birkenstock's earlier request." Dkt. 180-31 at 9-10. The letter also referred to a separate email exchange between Birkenstock and White Mountain that occurred in 2022.

On May 22, 2023, Birkenstock sent another letter to White Mountain referencing a May 8, 2023 email from White Mountain to Birkenstock in which White Mountain "proposed [a] sell-down" of its remaining Helga and Bari inventory. Id. at 18. In its letter, Birkenstock proposed conditions for its consent to "a limited period of time to sell-down the" allegedly infringing products. Id. at 19. In June 2023, White Mountain responded by denying any violations of Birkenstock's intellectual property rights and stating that White Mountain had "discontinued . . . use of the accused tread pattern" on the Helga and Bari "in the interest of resolving [the] dispute." Id. at 24.

On March 11, 2024, Birkenstock notified White Mountain that it had filed a complaint and would formally serve White Mountain absent confirmation in writing that White Mountain would stop making and selling the accused products.

**PROCEDURAL HISTORY**

Birkenstock filed suit in March 2024 and filed the operative second amended complaint in March 2025. Birkenstock brings five claims against White Mountain: patent infringement under 35 U.S.C §§ 271(a), 289 (Count I); trademark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (Count II); trademark and trade dress infringement, false designation of origin, passing off, and unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); common-law trademark and trade dress infringement and unfair competition (Count IV); and unfair and deceptive trade practices under Massachusetts General Laws Chapter 93A §§ 2, 11 (Count V).[8] White Mountain answered and asserted affirmative defenses, including that Birkenstock's claims were barred by the equitable doctrine of laches.

Over the next year, this case remained tied up in litigation, both parties clogging the docket with motions for summary judgment, motions to strike, and Daubert motions. On April 23, 2026, the Court held a hearing and ordered all motions stayed except White Mountain's motion for partial summary judgment as to Counts II, III, IV and V based on laches.

[8] On September 4, 2024, the Court denied White Mountain's motion to dismiss claims asserted in the first amended complaint, except as to one state statutory claim. See Birkenstock US BidCo, Inc. v. White Mountain Int'l LLC, 747 F. Supp. 3d 292, 303 (D. Mass. 2024). Birkenstock dropped that state statutory claim in its second amended complaint.

## LEGAL STANDARD

The standard for summary judgment is well established. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve . . . in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome . . . under the applicable law.'" Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving party" and "draw[] all reasonable inferences" in its favor. Id. (quoting Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 408 (1st Cir. 2015)).

## DISCUSSION

### I. Laches

"Laches . . . is an equitable doctrine which penalizes a litigant for negligent or wilful failure to assert his rights . . . ." Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental, 698 F.3d 9, 20 (1st Cir. 2012) (alterations in original) (quoting Valmor Prods. Co. v. Standard Prods. Corp., 464 F.2d 200, 204 (1st Cir. 1972)). "Laches requires proof of (1) lack

of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Id. at 21 (quoting Museum of Fine Arts, Bos. v. Seger-Thomschitz, 623 F.3d 1, 10 n.9 (1st Cir. 2010)); see K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 911 (1st Cir. 1989). But "laches applies only where the plaintiff knew or should have known of the infringing conduct." Id. A plaintiff is diligent if its actions in pursuing its rights are "reasonable." Algonquin Gas Transmission, LLC v. Weymouth, 919 F.3d 54, 61-62 (1st Cir. 2019). A showing of prejudice may rest on "a loss of evidence" or "the unavailability of important witnesses" over time. Vineberg v. Bissonnette, 548 F.3d 50, 57 (1st Cir. 2008).

"Laches is presumed to bar [Lanham Act] claims filed outside the analogous limitations period."[9] Belmora LLC v. Bayer Consumer Care AG, 987 F.3d 284, 294 (4th Cir. 2021); see Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 837 (9th Cir. 2002); Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 821 (7th Cir. 1999); Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996). The most analogous statute of limitations for a Lanham Act claim is the four-year period under Massachusetts General Laws Chapter 93A. See Davalos v. Baywaych Inc., 752 F. Supp. 3d 416,

[9] Because the parties do not distinguish between the application of laches to the Lanham Act claims and to the state law claims, the Court addresses the issue in terms of the Lanham Act claims.

424 (D. Mass. 2024), appeal filed, No. 25-1467 (1st Cir. May 15, 2025); Pegasystems, Inc. v. Appian Corp., 463 F. Supp. 3d 152, 161 (D. Mass. 2020). The laches period begins running when the relevant party "knew or should have known" of the wrongful conduct. Oriental, 698 F.3d at 21.

Here, Birkenstock contends that it first became aware of White Mountain and the accused products no later than approximately March 6, 2018. Birkenstock did not file suit until March 11, 2024. Because Birkenstock's claims were filed more than four years after Birkenstock became aware of White Mountain's accused products, laches is presumed to apply. See Pegasystems, Inc. v. Appian Corp., 633 F. Supp. 3d 456, 472-73 (D. Mass. 2022). That presumption places the burden on Birkenstock, as the party bringing the Lanham Act claims, to rebut the application of laches. See Jarrow Formulas, 304 F.3d at 837 (collecting cases applying presumption of laches).

## II. Unreasonable Delay and Progressive Encroachment

Birkenstock argues that the doctrine of progressive encroachment defeats White Mountain's laches defense by excusing "the delay upon which [laches is] premised." Oriental, 698 F.3d at 21 (alteration in original) (quoting Kellogg Co. v. Exxon Corp., 209 F.3d 562, 571 (6th Cir. 2000)). The doctrine of progressive encroachment generally "requires proof that (1) during the period of the delay the plaintiff could reasonably conclude that it should

not bring suit to challenge the allegedly infringing activity; (2) the defendant materially altered its infringing activities; and (3) suit was not unreasonably delayed after the alteration in infringing activity." Id. at 21–22. Facts bearing on the analysis of progressive encroachment include whether the presence of the defendant's allegedly infringing products in the market is growing, "the effect of that growth on the likelihood of confusion between the products, and when the infringement was of such significance as to . . . 'justify litigation.'" DayCab Co. v. Prairie Tech., LLC, 67 F.4th 837, 856 (6th Cir. 2023) (quoting Kellogg, 209 F.3d at 570).

For the following reasons, the Court holds that there are genuine disputes of fact as to each prong of the progressive encroachment test, which, if resolved in Birkenstock's favor, would defeat White Mountain's laches defense.

**A. Reasonableness of Not Bringing Suit**

The first prong of progressive encroachment can be satisfied by showing either that "the right to relief was uncertain at an earlier time as to justify delay in bringing suit" or that "the earlier infringement . . . , even if actionable, was so small in scope" -- that is, de minimis -- "that a reasonable trademark owner could conclude that an infringement suit was not worth the costs of bringing suit." Oriental, 698 F.3d at 23. Birkenstock contends that even if it had known of White Mountain prior to 2018, White

Mountain's infringement was de minimis during that time. Sales data from the 2010s does support Birkenstock's argument that the brands had disproportionate market positions. With one deviation in 2014, White Mountain's annual sales of the three accused products from 2013 to 2017 represented well under 1% of Birkenstock's annual sales for its corresponding products. Between 2018 and 2024, White Mountain's sales skyrocketed. During that period, White Mountain's dollar sales of the three accused products consistently accounted for between 1.8 and 3% of Birkenstock's corresponding sales. Based on the record, the Court concludes that there are disputed issues of material fact as to whether Birkenstock has proven the first prong of the progressive encroachment doctrine.

**B. Change in Infringing Activities**

The second prong requires Birkenstock to show that White Mountain materially altered its infringing activities. The First Circuit has ruled that this prong "turns . . . on the likelihood of confusion resulting from the defendant's moving into the same or similar market area and placing itself more squarely in competition with the plaintiff." Id. at 22 (alteration in original) (quoting Kellogg, 209 F.3d at 573). The progressive encroachment doctrine asks if the "defendant, after beginning its use of the mark, redirected its business so that it more squarely competed with [the] plaintiff and thereby increased the likelihood of public

confusion of the marks." Id. (quoting ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C., 314 F.3d 62, 70 (2d Cir. 2002)). The court may consider "[i]ncreases in the allegedly infringing advertising" as part of its analysis. Id.

Birkenstock contends that White Mountain redirected its business strategy in 2018 toward a new market in e-commerce with its expansion of its drop-ship business. See DayCab, 67 F.4th at 855 ("To apply the doctrine of progressive encroachment, something about the defendant's infringement must 'have changed significantly' . . . ." (quoting Nartron Corp. v. STMicroelectronics, Inc., 305 F.3d 397, 410 (6th Cir. 2002))). Birkenstock presents evidence that White Mountain made a strategic decision that year to focus on e-commerce and the drop-ship business over brick-and-mortar customers, resulting in a dramatic increase in White Mountain's sales. The dramatic increase in sales to Amazon.com and Shoes.com in 2018 supports a reasonable inference that online sales grew significantly in 2018. In 2019, the first year with division-specific data, e-commerce and drop-ship accounted for 2.3% of White Mountain's sales of the accused products. By 2024, those divisions together accounted for 17.2% of sales of the accused products.

White Mountain refutes the assertion that it redirected its business to put itself more squarely in competition with

Birkenstock. In support, it presents evidence that it already had an online business prior to 2018 and, therefore, that any increase to its drop-ship and e-commerce platforms reflected a natural expansion of its business, which does not support a progressive encroachment argument. See Kars 4 Kids Inc. v. Am. Can!, 98 F.4th 436, 449 (3d Cir. 2024) ("[A] normal expansion in the quantity of . . . advertising does not constitute progressive encroachment."); Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n, 465 F.3d 1102, 1110 (9th Cir. 2006) ("A junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute progressive encroachment.").

Birkenstock has thus raised a genuine dispute of fact regarding whether White Mountain altered its activities into new markets (from brick-and-mortar sales to drop-shipping) so as to compete more directly with Birkenstock in 2018. See Abraham v. Alpha Chi Omega, 708 F.3d 614, 623 (5th Cir. 2013) ("'[A]n increase in the scope of the unlicensed user's business' . . . could support a finding of progressive encroachment.").

**C. Response to New Infringing Activities**

Birkenstock faces another hurdle in the third prong -- whether the suit was unreasonably delayed after the alteration of the infringing activity. Birkenstock did not initiate this lawsuit until 2024, six years after it claims the infringement became

actionable and provable. Progressive encroachment excuses a reasonable delay in filing suit, "[b]ut when the accused use moves closer or increases in quantity, the doctrine of progressive encroachment requires the trademark owner to remain alert and to promptly challenge the new and significant acts of infringement." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:20 (5th ed. 2026).

Birkenstock has not fully explained why it waited until 2024 to file suit, other than a reference to COVID and the general difficulties caused by the pandemic. The pandemic does not justify such a long delay.

Birkenstock also cites its cease-and-desist letters to show that it was diligent in protecting its rights. The first letter, sent in 2021, did not specifically assert any trade dress claims, instead referencing only Birkenstock's design patents, copyrights, and registered trademarks, i.e., its BIRKENSTOCK name and Bone-Pattern Mark. Nonetheless, the first letter put White Mountain on notice of its claims. In the letter, Birkenstock accused White Mountain of "inten[ding] to copy not just the overall look and feel of Birkenstock footwear, but every key element that distinguishe[d]" Birkenstock's shoes and demanded that White Mountain surrender products bearing unauthorized versions of Birkenstock's trademarks and cease manufacturing, distribution, advertisement, and sale of those products. Dkt. 180-31 at 4.

Birkenstock first expressly asserted a trade dress claim in its second letter, sent in 2023, wherein it asserted its trade dress rights as to the Arizona, Boston, and Mayari and accused White Mountain of infringement through the manufacture and sale of the Helga, Getty/Bari and Gracie.

Here, the parties dispute how to determine the length of Birkenstock's delay, specifically whether cease-and-desist letters "toll" the laches period. When determining excusable delay, courts have distinguished between parties who are "sitting on their rights" versus those who are "attempting to resolve their differences . . . without resorting to litigation." Murphy v. Timberlane Reg'l Sch. Dist., 973 F.2d 13, 16 (1st Cir. 1992). Courts thus have refused to find unreasonable delay where the plaintiff attempted to resolve the matter outside of litigation. See, e.g., King v. Innovation Books, 976 F.2d 824, 833 (2d Cir. 1992) (affirming the district court's finding of no unreasonable delay where the plaintiff "continued to voice his objections to what seemed planned by [the defendants] and attempted to become fully informed and resolve the matter" prior to filing suit); Leonard v. United Airlines, Inc., 972 F.2d 155, 158 (7th Cir. 1992) ("Attempts to resolve a dispute without resorting to a court do not constitute unreasonable delay."). But see Gen. Elec. Co. v. Sciaky Bros., 304 F.2d 724, 727 (6th Cir. 1962) ("The fact that [the plaintiff] . . . negotiated with [the defendant] on a cross-

licensing basis did not in our judgment excuse the long delay in enforcing its own rights.”). However, a unilateral notice of infringement such as a cease-and-desist letter without any effort at a bilateral solution does not support a finding of excusable delay. See Hot Wax, 191 F.3d at 817, 824 (finding unreasonable delay where a plaintiff alleging Lanham Act violations from the mid-1970s to 1997 waited until between 1993 and 1995 to send the defendant letters accusing it of violations and only filed suit in 1997).

Birkenstock has raised a genuine dispute as to whether the two cease-and-desist letters and its efforts to resolve the claims justified its delay in filing this suit. Without a complete detailing of the communications between Birkenstock and White Mountain from Birkenstock’s initial December 2021 cease-and-desist letter to its March 2024 email attaching its complaint against White Mountain, the Court cannot determine whether such communications constitute a tolling of the laches period.

**III. Prejudice**

Birkenstock further argues that White Mountain cannot show that Birkenstock’s delay in filing its claims has unduly prejudiced it. Material prejudice can be either evidentiary or economic. See Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co., 379 F. Supp. 3d 53, 100 (D. Mass. 2019), aff’d on other grounds, 964 F.3d 1365 (Fed. Cir. 2020). With respect to evidentiary prejudice, White

Mountain contends that because Birkenstock no longer has Arizona and Boston pre-2014 sales records, White Mountain cannot adequately contest whether the Arizona and Boston had secondary meaning at that time, and it cannot do consumer surveys to determine secondary meaning because decades have passed. In addition, the founder of Birkenstock USA, Margot Fraser, passed away in 2017, so she cannot be questioned about her awareness of and toleration of third-party products. Birkenstock pushes back, arguing that it has relied on good-faith estimates of sales and that other witnesses are available from the 1990s.

White Mountain has offered ample evidence of evidentiary prejudice from Birkenstock's delay in bringing suit, as key witnesses and documents no longer exist. The problem for White Mountain, though, is there is no evidence of evidentiary prejudice after 2018, when Birkenstock contends it first learned of White Mountain. Accordingly, even if Birkenstock unreasonably delayed post-2018 in bringing suit, White Mountain has put forth no evidence of recent evidentiary prejudice. The issue of economic prejudice is disputed, and the Court has an inadequate record for determining whether White Mountain suffered economic damage from Birkenstock's failure to timely file suit after 2018.

## ORDER

For the foregoing reasons, White Mountain's motion for partial summary judgment (Dkt. 147) is **DENIED**, and both White

Mountain’s and Birkenstock’s motions to strike (Dkts. 198, 182) are **DENIED** as moot.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge